IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA,    )
        )
STATE OF OHIO, EX REL.    )
RICHARD CORDRAY    )
ATTORNEY GENERAL OF OHIO,    )
        )
    Plaintiffs,    )
        )
    v.    )
        )    Civil Action No.    1:09-CV-545
INEOS ABS (USA) Corporation,    )
LANXESS Corporation,    )
        )
        )
    Defendants.    )
_____)

## <u>COMPLAINT</u>

Plaintiffs, the United States of America, by the authority of the Attorney General of the United States and through its undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), and the State of Ohio, by and through Richard Cordray, Ohio Attorney General, at the written request of the Director of Environmental Protection, file this complaint and allege as follows:

### NATURE OF ACTION

1.      This action, which relates to a manufacturing facility located in Addyston, Ohio (the "Addyston Facility" or "the Facility"), is brought under the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq*; the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq.*; and the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9601 *et seq.*; to obtain civil

- 2 -

Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9601 *et seq.*; to obtain civil

penalties and injunctive relief for violations of these statutes, as well as their implementing

regulations. This Court has supplemental jurisdiction over the State law claims asserted by the

Ohio Environmental Protection Agency ("Ohio EPA") pursuant to Chapter 3704 of the Ohio

Revised Code ("R.C.") and the rules adopted thereunder.

### JURISDICTION, VENUE AND AUTHORITY

2.        Jurisdiction is vested in this Court pursuant to Section 113(b) of the CAA, 42 U.S.C.

§ 7413(b); Section 325(b)(3) and (c)(4) of EPCRA, 42 U.S.C. § 11045(b)(3) and (c)(4); Sections

103 and 113 of CERCLA, 42 U.S.C. §§ 9603(a) and 9613(b); and 28 U.S.C. §§ 1331, 1345, and

1355.

3.        Authority to bring this action for the United States is vested in the United States

Department of Justice pursuant to 28 U.S.C. §§ 516 and 519; Section 305 of the CAA, 42 U.S.C.

§ 7605; Section 113 of CERCLA, 42 U.S.C. § 9613; and Section 325(b)(3) and (c)(4) of

EPCRA, 42 U.S.C. § 11045(b)(3) and (c)(4).

### NOTICE

4.        Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), notice of the

commencement of this action has been given to Ohio EPA. Pursuant to Section 113(a) of the

CAA, 42 U.S.C. § 7413(a), U.S. EPA notified the Defendants and the State of Ohio of the

violations of the Ohio State Implementation Plan ("SIP") alleged in this Complaint more than 30

days prior to its filing.

- 3 -

## DEFENDANTS

5.      Defendant LANXESS Corporation ("LANXESS") is a duly incorporated company under the laws of the State of Delaware, with its corporate headquarters in Pennsylvania. LANXESS is a former owner and operator of the Facility.

6.      In 1996, Bayer Corporation ("Bayer") purchased the Addyston Facility. Based upon the reasonable opportunity for further investigation and discovery, on July 1, 2004, Bayer transferred ownership of the Facility to LANXESS AG of Germany, at which point, LANXESS AG owned and operated the Addyston Facility. Subject to the reasonable opportunity for further investigation and discovery, LANXESS AG transferred the Facility to LANXESS and, as a result of the terms of the transfer of the Addyston Facility from Bayer ultimately to LANXESS, LANXESS succeeded to or assumed certain liabilities of the Facility's operations, including the liabilities of Bayer at issue in this civil action.

7.      INEOS ABS (USA) Corporation ("INEOS") is the current operator and an owner of the Addyston Facility, and has been the operator and an owner since October 2007.

8.      INEOS is a corporation incorporated in the state of Delaware that has its corporate headquarters in the state of Delaware. Based upon the reasonable opportunity for further investigation and discovery, INEOS is a joint venture between LANXESS and the INEOS Group of the United Kingdom, with the INEOS Group having a 49% ownership interest and LANXESS having a 51% ownership interest in INEOS.

9.      Each Defendant is a "person" within the meaning of Section 329(7) of EPCRA, 42 U.S.C. § 11049(7); Section 302(e) of the CAA, 42 U.S.C. § 7602(e); and Section 103 of

- 4 -

CERCLA, 42 U.S.C. § 9603.  Each Defendant is also a "person" as defined by R.C.

§ 3704.01(O) and Ohio Administrative Code ("OHIO ADMIN. CODE") 3745-15-01(U).

## FACTS

10.        The Addyston Facility, which is located at 356 Three Rivers Parkway, Addyston,

Hamilton County, Ohio, 45001-2400, is a "facility" within the meaning of OHIO ADMIN. CODE

3745-31-01(OO) and OHIO ADMIN. CODE 3745-77-01(Q).

11.        At all times pertinent to this civil action, either LANXESS or INEOS was an owner

and operator of the Addyston Facility or a successor in interest to an owner and operator within

the meaning of Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9), and the OHIO ADMIN.

CODE 3745-15-01(T).

12.        The Addyston Facility manufactures ABS (acrylonitrile, butadiene, styrene) plastics

and resins, using different formulas of acrylonitrile, 1,3-butadiene ("butadiene"), styrene, and

other chemicals not at issue to create various forms of plastic pellets which can then be molded

into various products such as motor vehicle consoles, medical devices, and lawn and garden

equipment.

13.        The emissions units at the Addyston Facility that are the subject of this Complaint are

emissions units P001, P010, P022, P036, P042, P047, and P048.

## DEFINITIONS

14.        Unless otherwise expressly provided herein, terms used in this Complaint, which are

defined in the CAA, EPCRA, CERCLA, R.C. Chapter 3704, and/or in the regulations

promulgated pursuant thereto, will have the meaning assigned to them in those statutes and their

implementing regulations.

- 5 -

## STATUTORY BACKGROUND (CLEAN AIR ACT)

### General Provisions of the CAA

15.　　As set forth in Section 101(b)(1) of the CAA, 42 U.S.C. § 7401(b)(1), the CAA is designed to "protect and enhance the quality of the Nation's air so as to promote the public health and welfare and the productive capacity of the population."

16.　　Section 302(e) of the CAA, 42 U.S.C. § 7602(e), defines the term "person" as an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agency, or employee thereof.

17.　　Section 113 of the CAA, 42 U.S.C. § 7413, authorizes U.S. EPA to commence a civil action for injunctive relief and civil penalties against any person who has violated any requirement or prohibition of the CAA or regulations promulgated thereunder, or who has violated any applicable permit or state implementation plan.

18.　　Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the Administrator to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty against any person whenever such person has violated, or is in violation of, *inter alia*, the requirements or prohibitions described in the preceding Paragraph. Pursuant to the Federal Civil Penalties Inflation Adjustment Act (28 U.S.C. § 2461 note: Pub. L. 101-410, enacted October 5, 1990; 104 Stat. 890) ("Federal Civil Penalties Inflation Adjustment Act"), as amended by the Debt Collection Improvements Act of 1996 (31 U.S.C. § 3701 note; Pub. L. 104-134, enacted April 26, 1996; 110 Stat. 1321), U.S. EPA promulgated the Civil Monetary Penalty Inflation Adjustment Rule. Under that rule, U.S. EPA may seek civil penalties of up to $27,500 per day

- 6 -

for each violation occurring after January 30, 1997, $32,500 per day for each violation occurring after March 15, 2004, and $37,500 per day for each violation occurring after January 12, 2009. *See* 61 Fed. Reg. 69,360, at 69,364 (Dec. 31, 1996); 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 75,340, at 75,345 (Dec. 11, 2008).

**State Implementation Plan**

19.     Section 110(a)(1) of the CAA, 42 U.S.C. § 7410(a)(1), requires each state to adopt and submit to U.S. EPA for approval a State Implementation Plan ("SIP") that provides for the implementation, maintenance, and enforcement of the National Ambient Air Quality Standards ("NAAQS").

20.     Under Section 110(a)(2) of the CAA, 42 U.S.C. § 7410(a)(2), each SIP must include a permit program to regulate the modification and construction of any stationary source of air pollution as necessary to assure that NAAQS are achieved.

21.     Pursuant to Section 113(a) and (b) of the CAA, 42 U.S.C. § 7413(a) and (b), upon U.S. EPA approval, SIP requirements are federally enforceable under Section 113.  Under 40 C.F.R. § 52.23, any permit limitation or condition contained within a permit issued under an U.S.EPA-approved program that is incorporated in a SIP, is a requirement of the SIP, and is federally enforceable under Section 113.

22.     On October 31, 1980, U.S. EPA approved OHIO ADMIN. CODE 3745-31, the "Permit to Install" regulations, as part of the federally enforceable SIP for Ohio.  45 Fed. Reg. 72,143, at 72,146 (October 31, 1980).  Since then, U.S. EPA has approved several revisions to OHIO ADMIN. CODE 3745-31 into the federally enforceable SIP.

- 7 -

23.     OHIO ADMIN. CODE 3745-31-02(A) states that no person shall cause, permit, or allow

the installation of a new source of air pollutants or allow the modification of an air contaminant

source without first obtaining a permit to install ("PTI") from the Director of the Ohio EPA.

OHIO ADMIN. CODE 3745-31-05(C) states that the Director may impose such special terms and

conditions in a PTI as are appropriate or necessary to ensure compliance with the applicable laws

and to ensure adequate protection of environmental quality.

24.     Ohio EPA issued the Addyston Facility PTI 14-04577 on May 12, 1999 for unit P001,

PTI 14-05462 on December 23, 2003 for unit P036, and PTI 14-02539 on May 15, 1996 for unit

P048. These permits, among other things, set mass emission limits for units P001, P036 and

P048. Unit P001 is limited to emitting 23.6 pounds per day of organic compounds, P036 is

limited to emit 3.65 pounds per hour of organic compounds, and unit P048 is limited to emit

31.66 pounds per day of organic compounds. The underlying regulation for these limits is set

forth at OHIO ADMIN. CODE 3745-31-05(A), which has been incorporated in the Ohio SIP.

25.     OHIO ADMIN. CODE 3745-21-01(B)(1) defines a "day" as a period of 24 consecutive

hours beginning at midnight local time, or beginning at a time consistent with a facility's

operating schedule.

26.     Acrylonitrile, 1,3-butadiene, and styrene are each "organic compounds" within the

meaning of OHIO ADMIN. CODE 3745-21-01(B)(6).

27.     Acrylonitrile, 1,3-butadiene, and styrene each constitute "organic material" within the

meaning of OHIO ADMIN. CODE 3745-21-01(C)(4).

- 8 -

28.     OHIO ADMIN. CODE 3745-21-07(G)(2) limits the emissions of organic material from a source that employs photochemically reactive materials to 8 pounds per hour ("lbs/hr") and 40 pounds per day ("lbs/day") unless the emissions have been reduced by at least 85 percent.

29.     OHIO ADMIN. CODE Sections 3745-21-01(B), 3745-21-01(C) and 3745-21-07(G)(2) have been approved by U.S. EPA and incorporated in the Ohio SIP on October 31, 1980 (45 Fed. Reg. 72110).  On September 8, 1993, U.S. EPA approved revisions to OAC 3745-31 as part of the federally enforceable SIP. (58 Fed. Feg. 47211).

**NESHAP for Group IV Polymers and Resins/Subpart JJJ**

30.     Under Section 112(b) of the CAA, 42 U.S.C. § 7412(b), Congress established a list of 188 hazardous air pollutants ("HAPs") believed to cause adverse health or environmental effects.

31.     Under Section 112(c) of the CAA, 42 U.S.C. § 7412(c), Congress directed U.S. EPA to publish a list of all categories and subcategories of major sources and area sources of HAPs.

32.     The CAA defines "major source" as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).

33.     The CAA defines "area source" as any stationary source of HAPs that is not a major source.  42 U.S.C. § 7412(a)(2).

34.     The CAA defines "stationary source" as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (incorporating the definition of "stationary source" found at 42 U.S.C. § 7411(a)(3)).

- 9 -

35.     Under Section 112(d)(1) of the CAA, 42 U.S.C. § 7412(d)(1), Congress directed U.S. EPA to promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of HAPs listed under Section 112(c).

36.     Under Section 112(h) of the CAA, 42 U.S.C. § 7412(h), U.S. EPA may promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards, to the extent that it is not feasible to proscribe or enforce an emission standard for control of a HAP.

37.     These emission standards are known as National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for source categories.  Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), U.S. EPA has identified polymers and resins manufacturing operations as a source category of HAPs.  *See* 57 Fed. Reg. 31,576 (July 16, 1992).  To regulate these sources, U.S. EPA promulgated the NESHAP for Group IV:  Polymers and Resins, 40 C.F.R. Part 63, Subpart JJJ ("Subpart JJJ").  The "affected source" to which Subpart JJJ applies is defined as each group of one or more Thermoplastic Product Process Units ("TPPUs") and associated equipment that is manufacturing the same primary product and is located at a plant site that is a major source of HAPs.

38.     Subpart JJJ defines a TPPU as meaning a collection of equipment assembled and connected by hard-piping or ductwork, used to process raw materials and to manufacture a thermoplastic product as its primary product.  This collection of equipment includes unit operations, recovery operations equipment, process vents, equipment identified in 40 C.F.R. § 63.149, storage vessels as determined in 40 C.F.R. § 63.1310(g), and the equipment that is subject to the equipment leak provisions as specified in 40 C.F.R. § 63.1331.

- 10 -

39.     Among the products that constitute a "thermoplastic product" under Subpart JJJ is ABS using a batch emulsion or suspension process, ABS using a continuous emulsion or mass process, and SAN using a batch or continuous process.  40 C.F.R. § 63.1312.

40.     "Primary product" is defined in and determined by the procedures specified in 40 C.F.R. §§ 63.1310(f) and 63.1312.

41.     The Subpart JJJ NESHAP, at 40 C.F.R. § 63.1331, requires the owner and operator of each affected source to comply with the NESHAP for Equipment Leaks.  40 C.F.R. Part 63, Subpart H.

42.     "Equipment," for the purposes of the provisions in 40 C.F.R. § 63.1331 and the requirements of Subpart H that are referred to in 40 C.F.R. § 63.1331, means each pump, compressor, agitator, pressure relief device, sampling connection system, open-ended valve or line, valve, connector, surge control vessel, bottoms receiver, and instrumentation system in organic HAP service, and any control devices or systems required by 40 C.F.R. § 63.1312(b).

43.     40 C.F.R. § 63.161 defines equipment "in organic [HAP] service" as equipment that either contains or contacts a fluid that is at least 5% by weight of total organic HAPs.

44.     The equipment leak provisions of Subpart H set forth various equipment and work practice standards and testing and recordkeeping requirements, *inter alia*, to ensure that any leaks of HAPs from equipment are timely detected and repaired.  These provisions often are referred to as "Leak Detection and Repair" ("LDAR") provisions.

45.     The Subpart H NESHAP at 40 C.F.R. § 63.172 sets forth certain requirements for subject closed-vent systems and control devices.

- 11 -

46.	40 C.F.R. § 63.181(g)(3) requires the owner or operator to keep records of inspections of closed-vent systems conducted pursuant to 40 C.F.R. § 63.172(f)(1). Such documentation must include a date of inspection, and a statement that no leaks were found if that is the case. If a leak is detected, the source must keep records of the date the leak was discovered, the date of successful repair, operators names, and other items specified at 40 C.F.R. § 63.181(d) and (g)(3)(ii). Owners and operators must report these leaks to U.S. EPA in periodic reports pursuant to 40 C.F.R. § 63.1335(e)(6), and repair the leaks in accordance with 40 C.F.R. § 63.172(h).

47.	40 C.F.R. § 63.167(a)(1) requires the owner or operator of a subject source to equip each open-ended valve or line with a cap, blind flange, plug, or second valve that must, according to 40 C.F.R. § 63.167(a)(2), seal the open end at all times except: (1) during those operations which require process fluid flow through the open-ended valve or line; or (2) during maintenance and repair.

**LDAR Monitoring**

48.	40 C.F.R. § 63.180(b)(1) requires each owner or operator of a source subject to Subpart H to comply with the monitoring procedures and requirements of Method 21 at 40 C.F.R. Part 60, Appendix A, to determine if a process unit component is leaking.

49.	A leak is defined as 1,000 parts per million ("ppm") or greater for pumps in light liquid service (40 C.F.R. § 63.163(b)(2)(iii)(C)); 500 ppm or greater for valves in gas/vapor service or in light liquid service (40 C.F.R. § 63.168(b)(2)(iii)); 10,000 ppm or greater for agitators in gas/vapor service and light liquid service (40 C.F.R. § 63.173(a)(2)); and 500 ppm or greater for connectors in gas/vapor service or in light liquid service (40 C.F.R. § 63.174(a)(2)).

- 12 -

50.      40 C.F.R § 63.168(b)(1) requires that the owner or operator monitor valves in gas/vapor and light liquid service to detect leaks by the method specified in 40 C.F.R. § 63.180(b).  40 C.F.R. § 63.168(d) specifies the frequency at which monitoring shall be conducted.

51.      40 C.F.R. § 63.168(f)(1) requires that when a leak is detected for valves in gas/vapor service and in light liquid service, it shall be repaired as soon as practicable, but no later than 15 calendar days after the leak is detected, except as provided in 40 C.F.R. § 63.171.  40 C.F.R. § 63.168(f)(2) requires that a first attempt at repair of a leak shall be made no later than 5 calendar days after each leak is detected.

52.      40 C.F.R. § 63.174(a)(1) requires the owner or operator to monitor connectors in gas/vapor and light liquid service by the method specified in 40 C.F.R. § 63.180(b).  40 C.F.R. § 63.174(a) requires the owner or operator to monitor all connectors in gas/vapor and light liquid service, at the intervals specified in 40 C.F.R. § 63.174(b).

53.      40 C.F.R. § 63.174(d) requires that, when a leak is detected for connectors in gas/vapor service and in light liquid service, it shall be repaired as soon as practicable, but no later than 15 calendar days after the leak is detected, except as provided in 40 C.F.R. § 63.171.  A first attempt at repair of a leak shall be made no later than 5 calendar days after each leak is detected.

54.      40 C.F.R. § 63.163(b)(1) requires the owner or operator to monitor each pump in light liquid service monthly by the method specified in 40 C.F.R. § 63.180(b).

55.      40 C.F.R. § 63.163(c) requires that, when a leak is detected for pumps in light liquid service, it shall be repaired as soon as practicable, but no later than 15 calendar days after the

- 13 -

leak is detected, except as provided in 40 C.F.R. § 63.163(c). A first attempt at repair of a leak

shall be made no later than 5 calendar days after each leak is detected.

56.     40 C.F.R. § 63.173(a)(1) requires each agitator in gas/vapor service and in light liquid

service to be monitored monthly to detect leaks by the methods specified in 40 C.F.R.

§ 63.180(b), except as provided in 40 C.F.R. § 63.163(b).

57.     40 C.F.R. § 63.181(d) requires that certain information be recorded when a leak is

detected in a pump, connector, valve, agitator, closed-vent system or control device, including

the date of the successful repair of the leak and, if it is not repaired within 15 calendar days,

"repair delayed" and the reason for the delay must be recorded and kept for two years.

58.     40 C.F.R. § 63.182(d) requires the owner or operator of a source submit periodic

reports regarding the source's compliance status ("Periodic Reports"), and sets forth the

information that must be contained in such a Periodic Report.

**Title V Requirements**

59.     Title V of the CAA, 42 U.S.C. §§ 7661-7661f, establishes an operating permit

program for certain sources, including "major sources." The purpose of Title V is to ensure that

all "applicable requirements" for compliance with the CAA are collected in one place.

60.     Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b) provide

that, after the effective date of any permit program approved or promulgated under Title V of the

CAA, no source subject to Title V may operate except in compliance with a Title V permit.

61.     Regulations for state operating permit programs are codified at 40 C.F.R. Part 70

("Part 70 program"). U.S. EPA promulgated the Part 70 program regulations under the authority

of Section 502 of the CAA, 42 U.S.C. § 7661a.

- 14 -

62.     Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), provides that it shall be unlawful

for any person to violate any requirement of a permit issued pursuant to Section 502 of the CAA.

The regulation at 40 C.F.R. § 70.6(b)(1) specifies that all terms and conditions in a permit issued

under a Part 70 program, including any provisions designed to limit a source's potential to emit,

are enforceable by the Administrator of U.S. EPA under the CAA.

63.     U.S. EPA approved Ohio's Part 70 ("Title V") program, codified at Ohio Admin.

Code 3745-77, on August 15, 1995, with an effective date of October 1, 1995. 60 Fed. Reg.

42,045 (Aug. 15, 1995).

64.     Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b) provide

that, after the effective date of any permit program approved or promulgated under Title V of the

CAA, no source subject to Title V may operate except in compliance with a permit issued by a

permitting authority. Section 504(a) of the CAA, 42 U.S.C. § 7661c(a), implementing

regulations of the CAA, 40 C.F.R. § 70.2, and Ohio EPA's Title V operating permit program

regulations Ohio Admin. Code 3745-77 (and all relevant prior versions of these regulations)

have at all relevant times required that each Title V permit include, among other things,

conditions as are necessary to assure compliance with applicable requirements of the CAA.

65.     Section 113(a)(3) of the CAA, 42 U.S.C. § 7413(a)(3), authorizes the Administrator

to initiate an enforcement action whenever, among other things, the Administrator finds that any

person has violated or is in violation of a requirement or prohibition of Title V of the CAA, or

any rule promulgated, issued or approved under Title V of the CAA.

66.     Section 113(b) of the Act, 42 U.S.C. § 7413(b), provides for injunctive relief and civil

penalties of up to $27,500 per day for each violation occurring after January 30, 1997, $32,500

- 15 -

per day for each violation occurring after March 15, 2004, and $37,500 per day for each violation occurring after January 12, 2009.  *See* 61 Fed. Reg. 69,360, at 69,364 (Dec. 31, 1996); 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 75,340, at 75,345 (Dec. 11, 2008).

## GENERAL ALLEGATIONS - CLEAN AIR ACT

67.     Each Defendant is a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

68.     INEOS and LANXESS are each an "owner or operator," as defined in Section 112(a)(9) of the CAA, 42 U.S.C. § 7612(a)(9), of the Addyston Facility.

69.     The Addyston Facility is a "stationary source" within the meaning of Section 112(a)(3) of the CAA, 42 U.S.C. § 7412(a)(3), and a "source" as defined in OHIO ADMIN CODE 3745-15-01.  At all times relevant hereto, the Facility has operated, and continues to operate, several "stationary sources" of air emissions, that are subject to one or more NESHAPs found at 40 C.F.R. Part 63.

70.     The Addyston Facility processes or uses acrylonitrile, 1-3 butadiene, styrene, methyl ethyl ketone, butyl acrylate, terpinolene, methyl methacrylate, alpha methyl styrene, and methanol, which are HAPs as listed in Section 112(b)(1) of the CAA, 42 U.S.C. § 7412(b)(1).

71.     The Addyston Facility is a "major source" as defined at Section 112(a)(1), 42 U.S.C. § 7412(a)(1).

72.     The Addyston Facility operates one or more "TPPUs" as defined at 40 C.F.R. § 63.1312.

73.     The Addyston Facility TPPU operation is an "affected source" subject to Subpart JJJ, as provided at 40 C.F.R. § 63.1310.

- 16 -

74.　　　　Units P001, P004, P015, P021, P022, P042, and P047 are "process units" within the meaning of 40 C.F.R. § 63.171 and part of an "affected source" subject to Subpart JJJ.

75.　　　　The Addyston Facility is a plant site that is a major source of HAPs within the meaning of Section 112(a)(1) of the CAA, 42 U.S.C. § 7412(a)(1) and 40 C.F.R. § 63.2 .

76.　　　　Pursuant to Title V of the CAA, 42 U.S.C. §§ 7661 through 7661f, and state regulations, Ohio EPA issued the Addyston Facility Title V permit 14-31-01-0054 ("Title V Permit"), on August 30, 2004, pursuant to Ohio's Part 70 Program.  The Title V Permit had an effective date of September 20, 2004, and an expiration date of September 20, 2009.

## COUNT I - CLEAN AIR ACT – FLARE 99%

## CONTROL EFFICIENCY REQUIREMENT

77.　　　　Paragraphs 1 through 76 are incorporated herein by reference.

78.　　　　Unit P001 is a batch emulsion polymerization process producing ABS, SAN and acrylonitrile-styrene-acrylate.  The process consists of three batch reactors:  Reactor C; Reactor D; and Reactor E.

79.　　　　The P001 process has several process vents that emit butadiene, which is a VOC and a HAP.  The process vents from Reactor C and D flow to a closed vent system that directs process vent gases to a steam-assisted flare (the "Flare") for emission control.

80.　　　　On February 28, 1989, the Addyston Facility applied for a modification to PTI 14-1787 for unit P001, which was issued by Ohio EPA on October 12, 1989.  A subsequent modified PTI for P001 was issued May 12, 1999, PTI 14-04577.  Both PTIs were issued pursuant to OHIO ADMIN. CODE 3745-31.  On August 30, 2004, Ohio EPA issued the Addyston Facility its

- 17 -

Title V Permit which specifically provides that the plant is an affected source subject to the conditions of the PTI regulations and the Subpart JJJ NESHAP.

81.　　　PTI 14-01787 requires emissions from P001 to be vented to a flare having a control efficiency of at least 99%, or to a boiler for incineration with a control efficiency of 99.99%. PTI 14-04577 contains the same or a substantially similar requirement.

82.　　　The Title V Permit's Part II conditions for P001, at Condition A.I.2.a (p. 82), states, among other things, the following: "All process emissions from P001 shall be vented to a flare having a control efficiency of at least 99%, or to a boiler for incineration, with a control efficiency of at least 99.99%." Condition A.II.1 provides as follows: "The [F]lare shall be operated at all times when emissions may be vented to it [40 CFR 63.11(b)(3)]."

83.　　　The Title V Permit incorporates the requirements of 40 C.F.R. Part 63, Subparts H and JJJ, and PTI 14-04577.

84.　　　On numerous occasions within the tolling period for the applicable statute of limitations immediately preceding filing of this Complaint, the Addyston Facility failed to achieve 99% control of VOCs from the Flare while unit P001 was in operation.

85.　　　The Addyston Facility's failure to achieve 99% control efficiency is a violation of Sections 110 and 502 of the CAA, 42 U.S.C. §§ 7410 and 7661a, the implementing regulations at 40 C.F.R. § 70.7(b), its PTIs, and the Title V Permit.

86.　　　As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation occurring prior to March 16, 2004, $32,500 per day for each violation occurring between March

- 18 -

16, 2004 and September 30, 2007, and INEOS to penalties of up to $32,500 per day for each

violation occurring between October 1, 2007 and January 12, 2009, and up to $37,500 per day for

each violation occurring after January 12, 2009.

## COUNT II - CLEAN AIR ACT – FLARE MINIMUM

## HEAT CONTENT REQUIREMENT

87.  Paragraphs 1 through 86 are incorporated herein by reference.

88.  Condition A.II.4 of the Title V Permit provides, *inter alia*, that "[t]he permittee shall

adhere to the heat content specifications in 40 CFR 63.11(b)(6)(ii)…"  In turn, 40 C.F.R.

§ 63.11(b)(6)(ii) requires the net heating value of the P001 vent streams entering the Flare to be

300 British thermal units per standard cubic foot ("BTU/scf") or greater.

89.  On numerous occasions within the tolling period for the applicable statute of

limitations immediately preceding the filing of this Complaint, the Addyston Facility failed to

achieve a heat content for vent streams going to the Flare that controls P001 process emissions at

or above 300 BTU/scf.

90.  The Addyston Facility's failure to achieve the heat content of 300 BTU/scf of vent

streams going to the Flare is a violation of Sections 110 and 502 of the CAA, 42 U.S.C. §§ 7410

and 7661a, the implementing regulations at 40 C.F.R. § 70.7(b) and the Title V Permit.

91.  As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the

Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to

injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation

occurring prior to March 16, 2004, $32,500 per day for each violation occurring between March

16, 2004 and September 30, 2007, and INEOS to penalties of up to $32,500 per day for each

- 19 -

violation occurring between October 1, 2007 and January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

## COUNT III - CLEAN AIR ACT – CLAIM BY UNITED STATES FOR FAILURE TO COMPLY WITH SECTION 113 ADMINISTRATIVE ORDER

92.     Paragraphs 1 through 91 are incorporated herein by reference.

93.     Section 113(a)(1) of the CAA, 42 U.S.C. 7413(a)(1), provides that whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit, the Administrator shall notify the person and the State in which the plan applies of such finding.  At any time after the expiration of 30 days following the date on which the notice of violation is issued, Section 113(a)(1)(A), 42 U.S.C. 7413(a)(1)(A), provides that the Administrator may issue an order requiring such person to comply with the requirements or prohibitions of such plan or permit.

94.     On June 13, 2006, U.S. EPA issued a Notice of Violation/Findings of Violation ("NOV/FOV") to LANXESS stating that the Addyston Facility had failed to meet the 300 BTU/scf and 99% control efficiency requirements of its Title V Permit.

95.     On May 21, 2007, U.S. EPA issued to LANXESS administrative order No. EPA-5-07-113(a)-OH-01 pursuant to Section 113(a) of the CAA, 42 U.S.C. § 7413(a) ("Administrative Order"), which found that the Addyston Facility was in violation of the Flare's 99% control efficiency requirement under the PTIs and the Title V Permit and the requirement that all P001 process streams vented to the flare have a net heating value of 300 BTU/scf or greater, and

- 20 -

required compliance with these requirements within three months of issuance of the

Administrative Order.

96.     On various occasions since issuance of the Administrative Order, LANXESS failed to

comply with the requirements set forth in Paragraph 95 above, and therefore has been in violation

of Section 113(a) of the CAA, 42 U.S.C. 7413(a).

97.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the

Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to

injunctive relief and LANXESS to penalties of up to $32,500 per day for each violation.

**COUNT IV - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS –**

**FAILURE TO PROPERLY CONDUCT INSPECTION OF CLOSED-VENT SYSTEM**

98.     Paragraphs 1 through 97 are incorporated herein by reference.

99.     40 C.F.R. § 63.172 sets forth standards for closed-vent systems and control devices.

100.     The applicable requirements of 40 C.F.R. § 63.172 are incorporated into the Title V

Permit.

101.     "Closed-vent system" is defined at 40 C.F.R. § 63.161 as a system that is not open to

the atmosphere and that is composed of hard-piping ductwork, connections and, if necessary,

flow-inducing devices that transport gas or vapor from a piece or pieces of equipment to a

control device or back into a process.

102.     40 C.F.R. § 63.172(f) requires the owner and operator to inspect each subject closed-

vent system according to the procedures and schedule provided in subparagraphs (f)(1) and (2).

In turn, 40 C.F.R. § 63.172(f)(1)(ii) requires that, for closed-vent systems constructed of hard-

- 21 -

piping, the owner or operator shall conduct annual visual inspections for visible, audible, or olfactory indications of leaks.

103.    At the Addyston Facility, HAP emissions from Process Units P004, P015, part of P042, and P047 are vented through a network of hard piping that leads to the Facility's boiler for HAP control. The Addyston Facility refers to this network of hard piping as the "Main Duct."

104.    The Main Duct is a "closed-vent system" within the meaning of 40 C.F.R. § 63.161.

105.    The Main Duct is part of the affected source subject to Subpart JJJ at the Addyston Facility, and thus subject to the Subpart H standards for closed-vent systems under 40 C.F.R. § 63.172.

106.    During September 2005, U.S. EPA conducted an inspection of the Addyston Facility ("2005 Inspection").

107.    During the 2005 Inspection, Facility personnel informed U.S. EPA inspectors that the Facility performed required annual inspections of the Main Duct by walking underneath the piping and looking upward for leaks.

108.    The Main Duct is at certain points located approximately 20 feet above the plant floor. Given the location of the Main Duct, walking under the piping and conducting a visual inspection from the ground is insufficient to detect leaks as required under to 40 C.F.R. § 63.172(f)(1)(ii).

109.    Therefore, the Addyston Facility failed on one or more occasions to conduct adequate annual inspections of the Main Duct pursuant to 40 C.F.R. § 63.172(f)(1)(ii).

110.    The Addyston Facility's failure to adequately conduct annual inspections of the Main Duct as required by the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA,

- 22 -

42 U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.172(f)(1)(ii) and 70.7(b), and the Title V permit.

111.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation occurring prior to March 16, 2004, up to $32,500 per day for each violation occurring between March 16, 2004 and September 30, 2007, and INEOS to penalties of up to $32,500 per day for each violation occurring between October 1, 2007 and January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

**COUNT V - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS –**
**FAILURE TO KEEP RECORDS OF CLOSED-VENT SYSTEM INSPECTIONS**

112.     Paragraphs 1 through 111 are incorporated herein by reference.

113.     Subpart H, at 40 C.F.R. § 63.181(g)(3), requires the owner or operator to keep records of inspections of closed-vent systems conducted pursuant to 40 C.F.R. § 63.172(f)(1). Such documentation must include a date of inspection, and a statement that no leaks were found if that was the case.

114.     The Title V Permit incorporates the requirements of 40 C.F.R. § 63.181(g)(3).

115.     Subject to the reasonable opportunity for further investigation and discovery, the Facility failed to keep records of all areas of the closed-vent system ("Main Duct") inspections as required by 40 C.F.R. § 63.181(g).

116.     The Addyston Facility's failure to keep records of the Main Duct inspections as required by the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA, 42

- 23 -

U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.181(g) and 70.7(b), and the Addyston Facility's Title V permit.

117.	As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation occurring between prior to March 16, 2004, and up to $32,500 per day for each violation occurring between March 16, 2004 and September 30, 2007.

## COUNT VI - CLEAN AIR ACT – SUBPART H NESHAP LDAR
## REQUIREMENTS - FAILURE TO RECORD LEAKS

118.	Paragraphs 1 through 117 are incorporated herein by reference.

119.	40 C.F.R. § 63.181(g)(3)(ii) requires that information specified under 40 C.F.R. § 63.181(d) be recorded for inspections during which leaks were detected.

120.	The Title V Permit incorporates the applicable requirements of 40 C.F.R. § 63.181(g)(3)(ii).

121.	The Addyston Facility inspected the Main Duct for leaks several times during 2004 and identified certain leaks, some of which were not repaired within 15 days or by the end of the next process shutdown.

122.	Subject to the reasonable opportunity for further investigation and discovery, for leaks that were not repaired within 15 days or by the end of the process unit shutdown, the Facility failed to record the date the leak was detected, the date of the first repair attempt, and/or other required information pertaining to the leak.

- 24 -

123.     The Addyston Facility therefore failed to keep records of leaks detected during inspection of the Main Duct in violation of 40 C.F.R. § 63.181(g)(3)(ii).

124.     The Addyston Facility's failure to record leaks detected during inspection of the Main Duct is a violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. § 63.181(g)(3)(ii) and 70.7(b), and the Title V Permit.

125.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $32,500 per day for each violation occurring prior to October 1, 2007.

## COUNT VII - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS
### PERIODIC REPORTING OF LEAKS

126.     Paragraphs 1 through 125 are incorporated herein by reference.

127.     40 C.F.R. § 63.182(d) requires the owner or operator of a subject source to submit semi-annual Periodic Reports to demonstrate compliance with Subpart H.  As part of the information required to be submitted in a Periodic Report, 40 C.F.R. § 63.182(d)(2)(i) requires the number of valves and connectors for which leaks were detected, the percent leakers, an identification of leaks that were not repaired, and the total number of valves monitored during the previous monitoring period.

128.     The Title V Permit incorporates the applicable requirements of 40 C.F.R. § 63.182(d).

129.     On one or more occasions, LANXESS failed to submit accurate Periodic Reports, including by failing to report delays in repairing leaks, and under-reporting the number of valves and connectors monitored and the percent of leaking connectors.

- 25 -

130.　　LANXESS' failure to submit accurate Periodic Reports as required by the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA, 42 U.S.C. § 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.182(d) and 70.7(b) and the Title V Permit.

131.　　As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief and LANXESS to penalties of up to $27,500 per day for each violation occurring prior to March 16, 2004, and up to $32,500 per day for each violation occurring between March 16, 2004 and September 30, 2007.

## COUNT VIII - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS – FAILURE TO CONDUCT LEAK DETECTION MONITORING -PUMPS

132.　　Paragraphs 1 through 131 are incorporated herein by reference.

133.　　Subpart H, at 40 C.F.R. § 63.163(b)(1), requires the owner or operator to monitor each pump in light liquid service monthly by the method specified in 40 C.F.R. § 63.180(b).

134.　　The Title V Permit incorporates the applicable requirements of 40 C.F.R. § 63.163(b)(1).

135.　　In at least the period from approximately 2003 to 2008, the Addyston Facility operated pumps in light liquid service for Process Units P001, P004, P015, P021, P042 and P047. Such pumps have been and are subject to Subpart H.

136.　　Subject to the reasonable opportunity for further investigation and discovery, the Addyston Facility failed, for numerous monthly monitoring periods within the tolling period for the applicable statute of limitations immediately preceding filing of the Complaint, to conduct leak detection monitoring required by 40 C.F.R. § 63.163(b)(1) of all pumps in light liquid

- 26 -

service for Process Units P001, P004, P015, P021, P042, and P047, as required by 40 C.F.R. § 63.163(b)(1).

137.    The Addyston Facility's failure on various occasions to conduct monitoring of all pumps in light liquid service on a monthly basis as required by the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.163(b)(1) and 70.7(b) and the Title V Permit.

138.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation occurring prior to March 16, 2004, up to $32,500 per day for each violation occurring between March 16, 2004 and September 30, 2007, and INEOS to penalties of up to $32,500 per day for each violation occurring between October 1, 2007 and January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

## COUNT IX - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS –
## FAILURE TO CONDUCT LEAK DETECTION MONITORING - VALVES

139.    Paragraphs 1 through 138 are incorporated herein by reference.

140.    At 40 C.F.R § 63.168(b), Subpart H requires that the owner or operator monitor valves in gas/vapor and light liquid service to detect leaks by the method specified in 40 C.F.R. § 63.180(b).  40 C.F.R. § 63.168(d) specifies the frequency at which monitoring shall be conducted.

- 27 -

141.     The Title V Permit incorporates the requirements of 40 C.F.R § 63.168(b).

142.     40 C.F.R. § 63.168(b) provides the interval, determined by various factors, by which the owner or operator must monitor valves in gas/vapor and light liquid service.

143.     Since 2002, the Addyston Facility should have monitored valves in gas/vapor and light liquid service for P001, P004, P015, P042, and P047 on an annual basis.

144.     Subject to the reasonable opportunity for further investigation and discovery, the Facility, during the time period from approximately 2003 through 2006 and within the tolling period for the applicable statute of limitations immediately preceding filing of the Complaint, failed to conduct leak detection monitoring on an annual basis of all valves in gas/vapor and light liquid service, by a method specified in 40 C.F.R. § 63.180(b), in violation of 40 C.F.R. § 63.168(b), for the following Process Units:  P001; P004; P015; P042; and P047.

145.     The Facility's failure to monitor all subject valves on an annual basis as required by the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. § 70.7(b) and the Title V Permit.  As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation occurring before March 16, 2004, and up to $32,500 per day for each violation occurring between March 16, 2004 and September 30, 2007.

- 28 -

## COUNT X - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS –
## FAILURE TO CONDUCT LEAK DETECTION MONITORING - AGITATORS

146.     Paragraphs 1 through 145 are incorporated herein by reference.

147.     Subpart H, at 40 C.F.R. § 63.173(a)(1), requires that each agitator in gas/vapor service and in light liquid service be monitored monthly to detect leaks by the methods specified in 40 C.F.R. § 63.180(b).

148.     The Title V Permit incorporates the requirements of 40 C.F.R. § 63.173(a).

149.     Subject to the reasonable opportunity for further investigation and discovery, between 2003 and 2007, and within the tolling period for the applicable statute of limitations immediately preceding filing of the Complaint, the Addyston Facility failed to conduct monthly leak detection monitoring of all agitators in gas/vapor service and in light liquid service, by a method specified in 40 C.F.R. § 63.180(b), in violation of 40 C.F.R. § 63.173(a)(1), for the following Process Units:  P001; P004; P015; P021; P022; P042; and P047.

150.     Each month the Facility failed to conduct leak detection monitoring of all agitators in gas/vapor service and in light liquid service of a Process Unit subject to the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.173(a)(1) and 70.7(b) and the Title V Permit.

151.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation occurring prior to March 16, 2004, up to $32,500 per day for each violation occurring between March 16, 2004 and September 30, 2007.

- 29 -

## COUNT XI - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS –
## FAILURE TO CONDUCT LEAK DETECTION MONITORING - CONNECTORS

152.    Paragraphs 1 through 151 are incorporated herein by reference.

153.    Subpart H at 40 C.F.R. § 63.174(a) requires owners and operators to conduct LDAR monitoring, in accordance with 40 C.F.R. § 63.180(b), of all subject connectors in gas/vapor and light liquid service.  The frequency of connector monitoring for a Process Unit subject to Subpart H is determined by the methodology established under 40 C.F.R. § 63.174.

154.    The Title V permit incorporates the requirements of 40 C.F.R. § 63.174(a).

155.    On one or more occasions during the tolling period for the applicable statute of limitations immediately preceding filing of the Complaint, the Facility failed to conduct required leak detection monitoring of connectors at Process Unit P004 and on one occasion conducted such monitoring but failed to include every connector at Process Unit P042 in gas/vapor and light liquid service as required under Subpart H.

156.    The Facility's failure to conduct leak detection monitoring of all connectors subject to Subpart H at P004 and P042 as required by the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.174(a) and 70.7(b), and the Title V Permit.

157.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $32,500 per day for each violation occurring prior to October 1, 2007, and INEOS to penalties of up to $32,500 per day for each violation occurring between October 1, 2007 and January 12, 2009.

- 30 -

## COUNT XII - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS – FAILURE TO IDENTIFY EQUIPMENT SUBJECT TO LDAR REQUIREMENTS

158.     Paragraphs 1 through 157 are incorporated herein by reference.

159.     Subpart H, at 40 C.F.R. § 63.162(c), requires that each piece of equipment in a process unit that is subject to the leak standards of Subpart H be identified such that it can be distinguished readily from equipment that is not subject to Subpart H.

160.     The Title V Permit incorporates the requirements of 40 C.F.R. § 63.162(c).

161.     Subject to the reasonable opportunity for further investigation and discovery, beginning in at least November 2006, the Facility failed to identify equipment for at least one Process Unit subject to Subpart H with the exception of transfer pumps, in violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, and the implementing regulations at 40 C.F.R. §§ 63.162(c) and 70.7(b), and the Title V Permit.

162.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $32,500 per day for each violation occurring prior to October 1, 2007, and INEOS to penalties of up to $32,500 per day for each violation occurring between October 1, 2007 and January 12, 2009.

## COUNT XIII- CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS – FAILURE TO DESIGNATE EQUIPMENT AS UNSAFE OR DIFFICULT TO MONITOR, OR UNSAFE TO INSPECT

163.     Paragraphs 1 through 162 are incorporated herein by reference.

- 31 -

164.     Subpart H, at 40 C.F.R.§ 63.162(c) requires, *inter alia*, the recording of the following information pertaining to all pumps, valves, agitators, and connectors subject to Subpart H: (i) identification of equipment designated as unsafe to monitor, difficult to monitor, or unsafe to inspect and the plan for monitoring or inspecting this equipment; and (ii) a list of identification numbers for the equipment that is designated as difficult to monitor, an explanation of why the equipment is difficult to monitor, and the planned schedule for monitoring this equipment.

165.     The Title V Permit incorporates the applicable requirements of 40 C.F.R. § 63.162(c).

166.     Based upon the reasonable opportunity for further investigation and discovery, as of approximately November 2006, the Facility had failed to identify all pumps, valves, agitators, and connectors that are designated as unsafe to monitor, difficult to monitor, or unsafe to inspect and to record a plan for monitoring or inspecting this equipment, in violation of 40 C.F.R. § 63.162(c). The Addyston Facility further failed to record a list of identification numbers for the equipment that is designated as difficult to monitor, an explanation of why the equipment is difficult to monitor, and the planned schedule for monitoring this equipment, in violation of 40 C.F.R. § 63.162(c).

167.     The Addyston Facility's failures to identify and record a list of equipment as difficult or unsafe to monitor or unsafe to inspect described in Paragraph 166 above is a violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.162(c) and 70.7(b) and the Title V Permit.

168.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $32,500 per day for each violation

- 32 -

occurring prior to October 1, 2007, and INEOS to penalties of up to $32,500 per day for each

violation occurring between October 1, 2007 and January 12, 2009.

## COUNT XIV - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS – FAILURE TO TIMELY REPAIR VALVE LEAK

169.    Paragraphs 1 through 168 are incorporated herein by reference.

170.    Subpart H, at 40 C.F.R. § 63.168(f)(1), requires that, when a leak is detected for

valves in gas/vapor service and in light liquid service, it shall be repaired as soon as practicable,

but no later than 15 calendar days after the leak is detected, with certain exceptions not relevant

here.  In addition, 40 C.F.R. § 63.168(f)(2) requires that a first attempt at repair of a leak shall be

made no later than 5 calendar days after each leak is detected.

171.    The Title V Permit incorporates the applicable requirements of 40 C.F.R.

§ 63.168(f)(1).

172.    Based upon records obtained from INEOS, the Facility detected a leak for valve

07254 on December 29, 2006, and repair of the leak was made on February 15, 2007.

173.    The Facility thus failed to repair the leak for valve 07254 detected on December 29,

2006 within 15 calendar days after the leak was detected, in violation of 40 C.F.R.

§ 63.168(f)(1).  The Facility also failed to make a first attempt at repair of the leak for valve

07254 detected on December 29, 2006 within 5 calendar days after the leak was detected, in

violation of 40 C.F.R. § 63.168(f)(2).

174.    The Facility's failure to timely repair leaks as required by the Subpart H NESHAP is a

violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, the implementing

regulations at 40 C.F.R. §§ 63.168(f) and 70.7(b) and the Title V Permit.

175.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief and LANXESS to penalties of up to $32,500 per day for each violation occurring after March 15, 2004.

**COUNT XV - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS – FAILURE TO SEAL OPEN-ENDED VALVE OR LINE**

176.    Paragraphs 1 through 175 are incorporated herein by reference.

177.    The Subpart H NESHAP at 40 C.F.R. § 63.167(a)(1) requires the owner or operator of a subject source to equip each open-ended valve or line with a cap, blind flange, plug, or second valve that must, according to 40 C.F.R. § 63.167(a)(2), seal the open end at all times except:  (1) during those operations which require process fluid flow through the open-ended valve or line; or (2) during maintenance and repair.

178.    The Title V Permit incorporates the applicable requirements of 40 C.F.R. § 63.167(a)(1).

179.    During the 2005 Inspection, U.S. EPA inspectors observed the following:  point #00773 was missing an end cap, there was a loose flange at point #6027, and a valve in the pre-mix charge chute was not capped.

180.    The Facility thereby violated 40 C.F.R. § 63.167 because it failed to cap and/or cover piping system components as set forth in the Paragraph immediately above.

181.    The Facility's failure to seal open ended valves or lines as required by the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.167(a)(1) and 70.7(b) and the Title V Permit.

- 34 -

182.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the

Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to

injunctive relief and LANXESS to penalties of up to $32,500 per day for each violation occurring

after March 15, 2004.

## COUNT XVI - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS
## METHOD 21 FOR VALVES

183.     Paragraphs 1 through 182 are incorporated herein by reference.

184.     At 40 C.F.R. § 63.168(b)(1), and 40 C.F.R. § 63.180(b), the Subpart H NESHAP

requires that to detect leaks of valves, an owner or operator monitor valves using Method 21 at

40 C.F.R. Part 60, Appendix A, Section 8.3.1.

185.     The Title V Permit incorporates the requirements of 40 C.F.R. § 63.168(b)(1), and 40

C.F.R. § 63.180(b).

186.     Based upon monitoring and observations conducted during the inspection conducted

by U.S. EPA in June 2007 ("2007 Inspection"), the Facility has failed to perform leak monitoring

of valves in compliance with Method 21, in that the leak rates of valves monitored by U.S. EPA

differed significantly from the historical leak rates found by the Addyston Facility.

187.     The Addyston Facility's failure to properly monitor equipment using Method 21 as

required by the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA, 42

U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.168(b)(1), 63.180,

and 70.7(b) and the Title V Permit.

188.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the

Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to

- 35 -

injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation occurring prior to March 16, 2004 and $32,500 per day for each violation occurring between March 16, 2004 and September 30, 2007, and INEOS to penalties of up to $32,500 per day for each violation occurring between October 1, 2007 and January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

## COUNT XVII - CLEAN AIR ACT – SUBPART H NESHAP LDAR REQUIREMENTS METHOD 21 FOR CONNECTORS

189.     Paragraphs 1 through 188 are incorporated herein by reference.

190.     At 40 C.F.R. § 63.174(a)(1), and 40 C.F.R. § 63.180(b), the Subpart H NESHAP requires an owner or operator to monitor connectors for leaks using Method 21 at 40 C.F.R. Part 60, Appendix A, Section 8.3.1.

191.     The Title V Permit incorporates the requirements of 40 C.F.R. § 63.174(a)(1) and 40 C.F.R. § 63.180(b).

192.     Based upon monitoring and observations conducted during the 2007 Inspection, the Facility has failed to perform leak monitoring of connectors in compliance with Method 21, in that the leak rates of valves monitored by U.S. EPA differed significantly from the historical leak rates found by the Addyston Facility.

193.     The Facility's failure to properly monitor equipment using Method 21 as required by the Subpart H NESHAP is a violation of Sections 112 and 502 of the CAA, 42 U.S.C. §§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 63.174(a)(1), 63.180(b), and 70.7(b) and the Title V Permit.

- 36 -

194.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the

Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to

injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation

occurring prior to March 16, 2004 and $32,500 per day for each violation occurring between

March 16, 2004 and September 30, 2007, and INEOS to penalties of up to $32,500 per day for

each violation occurring between October 1, 2007 and January 12, 2009, and up to $37,500 per

day for each violation occurring after January 12, 2009.

## COUNT XVIII - CLEAN AIR ACT – ORGANIC COMPOUND
## EMISSION LIMIT VIOLATION – PTI 14-05462

195.     Paragraphs 1 through 194 are incorporated herein by reference.

196.     Ohio EPA issued PTI 14-05462 to the Facility pursuant to the PTI program

incorporated into the Ohio SIP.

197.     PTI 14-05462 provides that the Addyston Facility shall not exceed an organic

compound ("OC") emission rate of 3.65 lbs OC/hr at Unit P036.

198.     The OC 3.65 lbs/hr emissions rate limit is incorporated as an applicable requirement

in the Title V Permit.

199.     Subject to the reasonable opportunity for further investigation and discovery, the

Facility exceeded the OC emissions rate limit of 3.65 lbs/hr of PTI 14-05462 for Unit P036 on

the following occasions in approximately the following amounts of OC in lbs/hr:

   a.   On October 2, 2004, emission rate of 31.49 lbs/hr;

   b.   On January 24, 2005, emission rate of 93.86 lbs/hr;

   c.   On February 4, 2005, emission rate of 115.97 lbs/hr;

- 37 -

   d.   On February 5, 2005, emission rate of 150.47 lbs/hr;

   e.   On May 7, 2005, emission rate of 35.7 lbs/hr;

   f.   On May 10, 2005, emission rate of 21.5 lbs/hr;

   g.   On July 9, 2005, emission rate of 87.0 lbs/hr;

   h.   On September 16, 2005, emission rate of 69.3 lbs/hr;

   i.   On November 19, 2005, emission rate of 56.6 lbs/hr;

   j.   On February 23, 2006, emission rate of 63.6 lbs/hr;

   k.   On March 17, 2006, emission rate of 6.9 lbs/hr;

   l.   On March 25, 2006, emission rate of 129.63 lbs/hr;

   m.  On March 31, 2006, emission rate of 86.53 lbs/hr;

   n.   On April 23, 2006, emission rate of 223.0 lbs/hr;

   o.   On April 25, 2006, emission rate of 128.25 lbs/hr for the first release and 38.0 lbs/hr for the second release;

   p.   On May 31, 2006, emission rate of 60.8 lbs/hr for the first release, 128.7 lbs/hr for the second release, and 135.2 lbs/hr for the third release;

   q.   On June 1, 2006, emission rate of 73.6 lbs/hr;

   r.   On September 9, 2006, emission rate of 63.2 lbs/hr for the first release, 38.4 lbs/hr for the second release, and 83.5 lbs/hr for the third release; and

   s.   On September 11, 2006, emission rate of 41.2 lbs/hr for the first release and 100.8 lbs/hr for the second release.

200.      Each exceedance listed in the Paragraph immediately above was an exceedance of an OC emissions rate limit within the meaning of OHIO ADMIN. CODE 3745-21-01(B)(4).

- 38 -

201.      Each exceedance of the 3.65 lbs/hour emission limit for OC cited in Paragraph 199 is

a separate violation of OHIO ADMIN. CODE 3745-31, Sections 110 and 502 of the CAA, 42 U.S.C.

§§ 7412 and 7661a, the implementing regulations at 40 C.F.R. §§ 52.23, 70.7(b), PTI 14-05462

and the Title V Permit.

202.      As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the

Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to

injunctive relief, and subject LANXESS to penalties of up to $32,500 per violation per day.

## COUNT XIX - CLEAN AIR ACT – ORGANIC COMPOUND

## EMISSION LIMIT VIOLATION – PTI 14-02539

203.      Paragraphs 1 through 202 are incorporated herein by reference.

204.      Ohio EPA issued PTI 14-02539 to the Facility pursuant to the PTI program

incorporated into the Ohio SIP.

205.      PTI 14-02539 provides that the Addyston Facility shall not exceed an OC emission

rate of 31.66 lbs/hr at Unit P048.

206.      The OC emissions rate limit of 31.66 lbs/hr for Process Unit P048 is incorporated as

an applicable requirement in the Title V Permit.

207.      The Addyston Facility exceeded the OC emissions rate limit of 31.66 lbs/hr of PTI

14-02539 for Unit P048 on February 5, 2005 by emitting OC at an emissions rate of 150.47

lbs/hr.

208.      The Addyston Facility's exceedance on February 5, 2005 is a violation of OHIO

ADMIN. CODE 3745-31, Sections 110 and 502 of the CAA, 42 U.S.C. §§ 7410 and 7661a, the

implementing regulations at 40 C.F.R. §§ 52.23 and 70.7(b), and the Title V Permit.

- 39 -

209.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the

Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to

injunctive relief, and subject LANXESS to penalties of up to $32,500 per day for this violation.

## COUNT XX - CLEAN AIR ACT – ORGANIC COMPOUND

## EMISSION LIMIT VIOLATION – PTI 14-04577

210.     Paragraphs 1 through 209 are incorporated herein by reference.

211.     OHIO ADMIN. CODE 3745-21-01(B)(4) defines an "organic compound" as "any

compound of carbon excluding carbon monoxide, carbon dioxide, carbonic acid, metallic

carbides or carbonates, and ammonium carbonate."

212.     Butadiene is an OC within the meaning of OHIO ADMIN. CODE 3745-21-01(B)(4).

213.     Ohio EPA issued PTI 14-04577 to the Facility pursuant to the PTI program

incorporated into the Ohio SIP.

214.     PTI 14-04577 provides that the Addyston Facility shall not exceed an OC emission

rate of 23.6 lbs OC/hr at Unit P001.

215.     The OC emissions rate limit of 23.6 lbs/hr for Process Unit P001 is incorporated as an

applicable requirement in the Title V Permit.

216.     The Addyston Facility exceeded the OC emissions rate limit of 23.6 lbs/hr of PTI 14-

04577 for Unit P001 on February 23, 2005 with an exceedance of 333.33 lbs/hr of butadiene.

217.     The February 23, 2005 exceedence of the OC emissions rate limit of 23.6 lbs/hr cited

in the Paragraph immediately above is a violation of Sections 110 and 502 of the CAA, 42

U.S.C. §§ 7410, 7661a, the 40 C.F.R. §§ 52.23 and 70.7(b), the Ohio SIP at OHIO ADMIN. CODE

3745-21-07(G)(2) and the Title V Permit.

- 40 -

218.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the

Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to

injunctive relief, and subject LANXESS to penalties of up to $32,500 per day for this violation.

## COUNT XXI - CLEAN AIR ACT – ORGANIC MATERIAL EMISSION LIMIT

## VIOLATION – OHIO ADMIN. CODE 3745-21-07(G)(2)

219.     Paragraphs 1 through 218 are incorporated herein by reference.

220.     OHIO ADMIN. CODE 3745-21-07(G)(2), as approved by EPA, limits the organic

material ("OM") emissions from a source that employs photochemically reactive materials to 8

lbs/hr and 40 lbs/day unless the emissions have been reduced by at least 85 percent.

221.     The Addyston Facility employs "photochemically reactive material" in its processes

as that term is defined in OHIO ADMIN. CODE 3745-21-01(C).

222.     OAC 3745-21-01(C)(4) defines "organic material" as "any chemical compound

containing carbon, excluding carbon monoxide, carbon dioxide, carbonic acid, metallic carbides,

metallic carbonates, and ammonium carbonate."

223.     The emissions rate limit under OHIO ADMIN. CODE 3745-21-07(G)(2) was

incorporated into the Title V Permit to apply to Process Units P001 at Part III, ABS #1 POLY

(P001), Condition A.I.1, P010, P022, P036, and P048.

224.     Based upon the reasonable opportunity for further investigation and discovery, the

Facility exceeded the emission limitation under OHIO ADMIN. CODE 3745-21-07(G)(2),  which

prohibits each unit from emitting over 8 lbs/hr and 40 lbs/day of organic material ("Organic

Material") unless the emissions have been reduced by at least 85%, at the following process units

on the following dates and at the following times with the following emissions rates:

- 41 -

a. Beginning 7:00 a.m., October 2, 2004, through 8:00 a.m., October 4, 2004, Process Unit P036 emitted 1,543 lbs of uncontrolled Organic Material (average of 31.49 lbs/hr).

b. On December 15, 2004, Process Unit P022 emitted over an 8-minute period 700 lbs of uncontrolled Organic Material.

c. On January 24, 2005, Process Unit P036 emitted within a 2.312-hour period 217 lbs of uncontrolled Organic Material (93.9 lbs/hr).

d. On February 4, 2005, Process Unit P036 emitted uncontrolled Organic Material (116.6 lbs/hr; 125.6 lbs/day).

e. On February 5, 2005, Process Unit P036 emitted uncontrolled Organic Material (150.5 lbs/hr; 238.2 lbs/day).

f. On February 5, 2005, Process Unit P048 emitted uncontrolled Organic Material (40.3 lbs/hr; 63.8 lbs/day).

g. On February 23, 2005, Process Unit P001 emitted uncontrolled Organic Material (750 lbs/day; ).

h. On March 9, 2005, Process Unit P010 emitted uncontrolled Organic Material (43.54 lbs/hr; 243.8 lbs/day).

i. On July 9, 2005, Process Unit P036 emitted uncontrolled Organic Material (87.0 lbs/day).

j. On September 16, 2005, Process Unit P036 emitted uncontrolled Organic Material (69.3 lbs/day).

- 42 -

k. On November 19, 2005, Process Unit P036 emitted uncontrolled Organic Material (56.6 lbs/day).

l. On February 23, 2006, Process Unit P036 emitted uncontrolled Organic Material (63.6 lbs/day).

m. On March 25, 2006, Process Unit P036 emitted uncontrolled Organic Material (175 lbs/day).

n. On March 31, 2006, P036 emitted uncontrolled Organic Material (86.5 lbs/hr; 257.0 lbs/day).

o. On April 23, 2006, P036 emitted uncontrolled Organic Material (223.0 lbs/hr; 223.0 lbs/day).

p. On April 25, 2006, P036 emitted uncontrolled Organic Material (128.3 lbs/hr and 43.7 lbs.hr; 243 lbs/day).

q. On May 31, 2006, P036 emitted uncontrolled Organic Material (60.8 lbs/hr, 128.7 lbs/hr, and 135.2 lbs/hr; 426.10 lbs/day).

r. On June 1, 2006, P036 emitted uncontrolled Organic Material (73.6 lbs/hr; 73.6 lbs/day).

s. On September 9, 2006, P036 emitted uncontrolled Organic Material (63.2 lbs/hr and 100.8 lbs/hr; 185.1 lbs/day).

t. On September 11, 2006, P036 emitted uncontrolled Organic Material (41.2 lbs/hr and 100.8 lbs/hr; 142 lbs/day).

- 43 -

225.　　Each exceedence of emission limits cited in the Paragraph above is each a separate violation of Sections 110 and 502 of the CAA, 42 U.S.C. §§ 7410, 7661a, 40 C.F.R. § 70.7(b), the Ohio SIP at OHIO ADMIN. CODE 3745-21-07(G)(2) and the Title V Permit.

226.　　As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation prior to March 16, 2004, and $32,500 per day for each violation occurring after March 16, 2004.

## STATUTORY BACKGROUND – CERCLA SECTION 103 REPORTING REQUIREMENTS

227.　　Section 102(a) of CERCLA, 42 U.S.C. § 9602(a), requires the Administrator of U.S. EPA to publish a list of substances designated as hazardous substances which when released into the environment may present a substantial danger to public health or welfare or the environment, and to promulgate regulations establishing that quantity of any hazardous substance, the release of which shall be required to be reported under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a) ("RQ"). The list of RQs of hazardous substances is codified at 40 C.F.R. Part 302.

228.　　Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), as implemented by 40 C.F.R. Part 302, requires, in relevant part, a person in charge of a facility, as soon as he/she has knowledge of a release (other than a federally permitted release) of a hazardous substance from such facility in quantities equal to or greater than the RQ.

- 44 -

## GENERAL ALLEGATIONS - CERCLA SECTION 103

229.     The Addyston Facility consists of buildings, structures, and equipment where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

230.     The Addyston Facility is a "facility," as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), and 40 C.F.R. § 302.3.

231.     Defendants are each a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), and 40 C.F.R. § 302.3.

232.     1,3-butadiene ("butadiene") is a hazardous substance, as defined under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14) and 40 C.F.R. Part 302.4, with an RQ of ten (10) pounds, as listed in 40 C.F.R. Part 302, Table 302.4.

233.     At all times relevant to this civil complaint, Defendant was "in charge of the facility" as that term is used in Section 103 of CERCLA, 42 U.S.C. § 9603(a)

234.     Acrylonitrile is a hazardous substance, as defined under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14) and 40 C.F.R. Part 302.4, with an RQ of one hundred (100) pounds, as listed in 40 C.F.R. Part 302, Table 302.4.

235.     Sodium hypochlorite is a hazardous substance, as defined under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14) and 40 C.F.R. Part 302.4, with an RQ of one hundred (100) pounds, as listed in 40 C.F.R. Part 302, Table 302.4.

- 45 -

## COUNT XXII – CERCLA SECTION 103

236.     The allegations of Paragraphs 1 through 14 and Paragraphs 227 through 235 are

incorporated herein by reference.

237.     Subject to the reasonable opportunity for further investigation and discovery, the

Addyston Facility released the following hazardous substances on the following dates:

   a.   March 3, 2004 release of approximately 40 lbs of butadiene (4 times RQ),

        beginning at or about 1:30 p.m., but did not notify the NRC until

        approximately 5:32 p.m. that day.

   b.   March 6, 2004, release of approximately 220 lbs of butadiene (20 times

        RQ), beginning at or about 2:49 p.m., but did not notify NRC until

        approximately 8:24 a.m. on March 8, 2004.

   c.   June 27, 2004, release of approximately 180 lbs of acrylonitrile (1.8 times

        RQ), beginning at or about 3:00 p.m., but did not notify the NRC until June

        28, 2004 at approximately 12:50 p.m.

   d.   On October 2, 2004, release of approximately 1,122 lbs of acrylonitrile

        (11.2 times RQ), and 34 lbs of butadiene (3.4 times RQ) beginning at or

        about 7:00 a.m., but did not notify NRC until October 4, 2004 at

        approximately 9:00 a.m.

   e.   On December 15, 2004, release of approximately 700 lbs of acrylonitrile (7

        times RQ) beginning at or about 3:48 p.m., but did not notify NRC until

        December 15, 2004 at approximately 4:22 p.m.

- 46 -

  f. On February 23, 2005, release of approximately 750 lbs of butadiene (75 times RQ) beginning at or about 4:30 p.m., but did not notify NRC until February 23, 2005 at approximately 7:43 p.m.

  g. July 17, 2005 release of approximately 750 lbs of butadiene (2.5 times RQ) beginning at approximately midnight, but did not notify NRC until 2:57 p.m.

  h. On May 31, 2006 release of approximately 151 lbs of acrylonitrile beginning at or about 9:54 a.m., which was first of four releases on that day, but did not notify NRC until June 1, 2006 at approximately 10:20 a.m.

238. The releases listed in the Paragraph immediately above constitute releases of a hazardous substance in a quantity equal to, or greater than, the RQ for that hazardous substance.

239. The releases listed in Paragraph 237 above were not "federally permitted releases" as that term is used in Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6, and defined in Section 101(10) of CERCLA, 42 U.S.C. § 9601(10).

240. LANXESS was either "in charge of" the Addyston Facility or is the corporate successor to the entity that was in charge of the Facility on the dates the releases occurred within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

241. Subject to the reasonable opportunity for further investigation and discovery, LANXESS or its corporate predecessor had knowledge within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), of the releases listed in Paragraph 237 above at or about the time the releases occurred.

- 47 -

242.     LANXESS or its corporate predecessor failed to immediately notify the NRC of the releases listed in Paragraph 237 above, as soon as it had knowledge of the release within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

243.     LANXESS or its corporate predecessor's failure to immediately notify the NRC upon knowledge of the releases listed in Paragraph 237 above are each violations of Section 103 of CERCLA, 42 U.S.C. § 9603, and therefore is subject to the assessment of penalties under Section 109(c) of CERCLA, 42 U.S.C. § 9609(c).

244.     As provided in Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation occurring between January 30, 1997, and March 15, 2004 and up to $32,500 per day for each such violation occurring after March 16, 2004.

**STATUTORY BACKGROUND -- EPCRA REPORTING REQUIREMENTS**

245.     EPCRA was enacted on October 17, 1986 as Title III of the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 (1986) (codified at 42 U.S.C. §§ 11002-11050).

246.     The purpose of EPCRA was to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency planning efforts to control any accidental releases.  Emergency Planning and Community Right-to-Know Programs, Interim Final Rule, 51 Fed. Reg. 41,570 (Nov. 17, 1986).

247.     To achieve this end, EPCRA imposes a system and mandates notification requirements on industrial and commercial facilities and mandates that state emergency response

- 48 -

commissions ("SERCs") and local emergency planning committees ("LEPCs") be created. EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of a health-threatening release. The LEPCs are charged with developing emergency response plans based on the information provided by facilities. Sections 301-303 of EPCRA, 42 U.S.C. §§ 11001-11003.

248.     Section 302(a) of EPCRA, 42 U.S.C. § 11002(a), requires the Administrator of the EPA to publish a list of extremely hazardous substances which, when released into the environment, may present a substantial danger to public health or welfare or the environment, and to promulgate regulations establishing that quantity of hazardous substance, the release of which shall be required to be reported under Sections 304(b) and 304(c) of EPCRA, 42 U.S.C. §§ 11004(b) and (c) ("Reportable Quantity" or "RQ"). The list of RQs for CERCLA hazardous substances is codified at 40 C.F.R. Part 302.

249.     Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and 40 C.F.R. § 372.3 define "facility" to mean, in relevant Part, all buildings, equipment, structure and other stationary items that are located on a single site and that are owned or operated by the same person.

250.     Sections 304(a) and (b) of EPCRA, 42 U.S.C. §§ 11004(a) and (b), and the regulations found at 40 C.F.R. § 355.40, require the owner or operator of a facility at which hazardous chemicals are produced, used or stored, to immediately notify, when there has been a release equal to or greater than the RQ of any EPCRA extremely hazardous substance or CERCLA hazardous substance, the SERC of any state likely to be affected by the release, and the LEPC of any area likely to be affected by the release.

- 49 -

## GENERAL ALLEGATIONS – EPCRA

251.     INEOS and LANXESS are each a "person" within the meaning of Section 329(7) of EPCRA, 42 U.S.C. § 11049(7) and R.C. 3750.01(K).

252.     INEOS and LANXESS are or were "owners or operators" of the Addyston Facility, within the meaning of Section 304 of EPCRA and Ohio Admin. Code 3750-1-01(OO).

253.     The Addyston Facility is a "facility" within the meaning of Section 329(4) of EPCRA, 42 U.S.C. § 11049(4) and R.C. 3750.01(D).

254.     The Addyston Facility is a facility at which hazardous chemicals are produced, used or stored.

255.     Butadiene is a hazardous substance as that term is defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), with an RQ of 10 pounds, as specified in 40 CFR § 302.4 and Ohio Admin. Code 3745-31-01(GG).

256.     Acrylonitrile is a hazardous substance as that term is defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), both with an RQ of 100 pounds, as specified in 40 CFR § 302.4 and Ohio Admin. Code 3745-31-01(GG).

257.     The Facility consists of buildings, equipment and structures which are located on a single site or on contiguous or adjacent sites and which are owned by the same person, entity, or corporation.

258.     At all times relevant to this Complaint, the Ohio EPA served as the emergency contact for the SERC for the State of Ohio, under Section 301(a) of EPCRA, 42 U.S.C. §11001(a).

- 50 -

259.     At all times relevant to this Complaint, the Hamilton County Department of Civil Defense was the LEPC for an area likely to be affected by a release from the Addyston Facility.

**COUNT XXIII – EPCRA**

260.     Paragraphs 1 through 14 and Paragraphs 245 through 259 are incorporated herein by reference.

261.     Subject to reasonable opportunity for further investigation and discovery, the Facility released the following hazardous substances on the following dates:

    a.  March 3, 2004 release of approximately 40 lbs of butadiene (4 times RQ) beginning at 1:30 p.m, but Facility did not notify Ohio EPA and Hamilton County Department of Civil Defense until at or about 5:32 p.m.

    b.  March 6, 2004, release of approximately 220 lbs of butadiene (22 times RQ), beginning at 2:49 p.m., but did not notify Ohio EPA until March 8, 2004 approximately 8:31 a.m. and Hamilton County Department of Civil Defense until at or about 8:37 a.m.

    c.  June 27, 2004, release of approximately 180 lbs of acrylonitrile (1.8 times RQ), beginning at or about 3:00 p.m., but did not immediately notify Ohio EPA or Hamilton County Department of Civil Defense.

    d.  On October 2, 2004, release of approximately 1,122 lbs of acrylonitrile (11.2 times RQ), and 34 lbs of butadiene (3.4 times RQ) beginning at or about 7:00 a.m., but did not immediately notify Ohio EPA or Hamilton County Department of Civil Defense.

- 51 -

    e.   On December 15, 2004, release of approximately 700 lbs of acrylonitrile (7 times RQ) beginning at or about 3:48 p.m., but did not immediately notify Ohio EPA or Hamilton County Department of Civil Defense.

    f.   On February 23, 2005, release of approximately 750 lbs of butadiene (75 times RQ) beginning at or about 4:30 p.m., but did not notify Ohio EPA or Hamilton County Department of Civil Defense until approximately 7:43 p.m.

    g.   On May 31, 2006 beginning at or about 9:54 a.m. four different releases of approximately 151 lbs of acrylonitrile (1.51 times RQ), but did not notify Ohio EPA until June 1, 2006 at approximately 10:28 a.m. or Hamilton County Department of Civil Defense until June 1, 2006 at approximately 10:33 a.m.

262.    The releases listed in the Paragraph immediately above each constitute a release of a hazardous substance in a quantity equal to, or greater than, the RQ for that hazardous substance.

263.    The State of Ohio was likely to be affected by the releases listed in Paragraph 261 above.

264.    The area subject to the jurisidiction of the Hamilton County Department of Civil Defense was likely to be affected by releases listed in Paragraph 261 above.

265.    The releases listed in Paragraph 261 above required notice under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

- 52 -

266.     Subject to the reasonable opportunity for further investigation and discovery,

LANXESS or its corporate predecessor had knowledge within the meaning of Sections 304(a)

and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), of the releases listed in Paragraph 261 above.

267.     The Addyston Facility's failures to immediately notify Ohio EPA and the Hamilton

County Department of Civil Defense of the releases listed above in Paragraph 261 are violations

of Sections 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b).

268.     As provided in Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), and pursuant to the

Federal Civil Penalties Inflation Adjustment Act, the violations set forth above subject INEOS to

injunctive relief, and subject LANXESS to penalties of up to $27,500 per day for each violation

occurring between January 30, 1997, and March 15, 2004 and up to $32,500 per day for each

violation occurring after March 16, 2004.

**COUNT XXIV – OHIO R.C. 3704.05 – CREATING A PUBLIC NUISANCE –**

**DECEMBER 15, 2004 ACRYLONITRILE RELEASE**

**INCIDENT FROM EMISSIONS UNIT P022**

**(Ohio State-Only Claim)**

269.     Paragraphs 1 through 14 and Paragraphs 245 to 267 are incorporated herein by

reference.

270.     R.C. 3704.05(G) provides, in part, that no person shall violate any rule of the Director

issued, adopted, or made under R.C. Chapter 3704.

271.     OHIO ADMIN. CODE 3745-15-07 provides, in part, the emission or escape into the

open air from any source or sources whatsoever, of smoke, ashes, dust, dirt, grime, acids, fumes,

gases, vapors, odors, or any other substances or combinations of substances, in such manner or in

- 53 -

such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance.  It shall be unlawful for any person to cause, permit, or maintain any such public nuisance.

272.      R.C. 3704.05(J)(2) provides, in part, that no person shall violate any applicable requirement of a Title V Permit or any permit condition.

273.      On August 30, 2004, Ohio EPA issued a Title V permit to LANXESS that includes emissions unit P022.

274.      The Title V permit prohibits air contaminants emitted by P022 from causing a public nuisance in violation of OHIO ADMIN. CODE 3745-15-07.

275.      The appropriate health based standard to determine if a public health threat occurred is the Emergency Response Planning Guideline-1 ("ERPG-1").

276.      The ERPG-1 is the maximum airborne concentration below which most individuals could be exposed for up to one hour without experiencing anything other than mild transient adverse health effects or perceiving a clearly defined objectionable odor.

277.      An air dispersion model was used by Ohio EPA to predict off-site concentrations. The modeling was used to determine the worst-case off-site impact of the December 15, 2004 release from emissions unit P022.

278.      A modeled worst-case off-site concentration that exceeds the ERPG-1 for a given pollutant is an air pollution nuisance and prohibited under OHIO ADMIN. CODE 3745-15-07.

279.      On December 15, 2004, worker error at the facility caused 700 pounds of acrylonitrile to be emitted over an 8-minute period from emissions unit P022.

- 54 -

280.	The modeled worst-case off-site concentration of acrylonitrile resulting from the December 15, 2004 release was 582 parts per million. This exceeds the ERPG-1 standard for acrylonitrile of 10 parts per million and thus constitutes an air pollution nuisance. This emission endangered the health, safety, or welfare of the public.

281.	The acts alleged in this count constitute violations of the Title V Permit, R.C. 3704.05(J)(2), R.C. 3704.05(G), and OHIO ADMIN. CODE 3745-15-07, which subject Defendants to injunctive relief and civil penalties of up to $25,000 per day for each violation, pursuant to R.C. 3704.06(C).

## COUNT XXV – OHIO R.C. 3704.05 – CREATING A PUBLIC NUISANCE –
## FEBRUARY 23, 2005 1,3 - BUTADIENE RELEASE
## INCIDENT FROM EMISSIONS UNIT P001

**(Ohio State-Only Claim)**

282.	Paragraphs 1 through 14 and Paragraphs 245 through 281 are incorporated herein by reference.

283.	R.C. 3704.05(G) provides, in part, that no person shall violate any rule of the Director issued, adopted, or made under R.C. Chapter 3704.

284.	OHIO ADMIN. CODE 3745-15-07 provides, in part, the emission or escape into the open air from any source or sources whatsoever, of smoke, ashes, dust, dirt, grime, acids, fumes, gases, vapors, odors, or any other substances or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit, or maintain any such public nuisance.

- 55 -

285.     R.C. 3704.05(J)(2) provides, in part, that no person shall violate any applicable requirement of a Title V permit or any permit condition.

286.     On August 30, 2004, Ohio EPA issued a Title V Permit to LANXESS that includes emissions unit P001.

287.     The Title V Permit prohibits air contaminants emitted by emissions unit P001 from causing a public nuisance in violation of OHIO ADMIN. CODE 3745-15-07.

288.     The appropriate health based standard to determine if a public health threat occurred is ERPG-1.

289.     The ERPG-1 is the maximum airborne concentration below which most individuals could be exposed for up to one hour without experiencing anything other than mild transient adverse health effects or perceiving a clearly defined objectionable odor.

290.     An air dispersion model was used by Ohio EPA to predict off-site concentrations. The modeling was used to determine the worst-case off-site impact of the February 23, 2005 release from emissions unit P001.

291.     A modeled worst-case off-site concentration that exceeds the ERPG-1 for a given pollutant is an air pollution nuisance and prohibited under OHIO ADMIN. CODE 3745-15-07.

292.     On February 23, 2005, a malfunction of two valves in the manufacturing process associated with P001 caused 750 pounds of 1,3-butadiene to be emitted directly into the atmosphere from approximately 4:30 p.m. until 6:45 p.m. from emissions unit P001.

293.     The modeled worst-case off-site concentration of 1,3-butadiene resulting from the February 23, 2005 release was 25.7 parts per million.  This exceeds the ERPG-1 standard for 1,3-butadiene of 10 parts per million and thus constitutes an air pollution nuisance.

- 56 -

294.     This release endangered the health, safety, or welfare of the public.

295.     The acts alleged in this count constitute violations of the Title V Permit, R.C.

3704.05(J)(2), R.C. 3704.05(G), and OHIO ADMIN. CODE 3745-15-07, which subject Defendants

to injunctive relief and civil penalties of up to $25,000 per day for each violation, pursuant to

R.C. 3704.06(C).

## COUNT XXVI – OHIO R.C. 3704.05 – CREATING A PUBLIC NUISANCE –

## PERSISTENT ELEVATED AMBIENT AIR CONCENTRATIONS

## OF HAZARDOUS AIR POLLUTANTS

**(Ohio State-Only Claim)**

296.     Paragraphs 1 through 14 and Paragraphs 245 through 295 are incorporated by

reference herein.

297.     R.C. 3704.05(G) provides, in part, that no person shall violate any rule of the Director

issued, adopted, or made under R.C. Chapter 3704.

298.     OHIO ADMIN. CODE 3745-15-07 provides, in part, the emission or escape into the

open air from any source or sources whatsoever, of smoke, ashes, dust, dirt, grime, acids, fumes,

gases, vapors, odors, or any other substances or combinations of substances, in such manner or in

such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable

injury or damage to property, is hereby found and declared to be a public nuisance.  It shall be

unlawful for any person to cause, permit, or maintain any such public nuisance.

299.     R.C. 3704.05(J)(2) provides, in part, that no person shall violate any applicable

requirement of a Title V permit or any permit condition.

- 57 -

300.     On August 30, 2004, Ohio EPA issued a Title V permit to LANXESS.

301.     The Title V Permit prohibits air contaminants emitted by the emissions units covered by the Title V permit from causing a public nuisance in violation of OHIO ADMIN. CODE 3745-15-07.

302.     Hazardous air pollutants are defined as "any air pollutant listed in, or pursuant to, Section 112(b) of the Clean Air Act" as defined by OHIO ADMIN. CODE 3745-31-01(WW).

303.     The Facility is a source of many HAPs, including acrylonitrile, 1,3-butadiene, and styrene.

304.     On various occasions from at least May 10, 2005 and continuing to the present, the emissions of HAPs from the Facility caused elevated ambient air concentrations of HAPs beyond the fence line of the Facility's property as determined by air monitoring results from a monitor located on the rooftop of Meredith Hitchens Elementary School, approximately 300 feet from the Facility's fence line.

305.     These emissions endanger the health, safety, or welfare of the public.  Therefore, the emissions of HAPs from the Facility constitute an air pollution nuisance for public health.

306.     1,3-butadiene is classified by the U.S. EPA as carcinogenic to humans through inhalation.

307.     The emissions of 1,3-butadiene from the Facility have caused elevated ambient air concentrations of 1,3-butadiene in the vicinity of the Facility, resulting in a cancer risk calculation of approximately 1.6 in 10,000 excess cancer risk to the surrounding affected population.

- 58 -

308.　　　The acts alleged in this count constitute violations of R.C. 3704.05(G) and OHIO

ADMIN. CODE 3745-15-07, which subject Defendants to injunctive relief and civil penalties of up

to $25,000 per day for each violation, pursuant to R.C. 3704.06(C).

## PRAYER FOR RELIEF

Unless restrained by order of this Court, one or more of the violations described above are likely

to continue or recur.  WHEREFORE, Plaintiffs, the United States of America and the State of

Ohio respectfully request that this Court grant the following relief:

309.　　　Permanently enjoin INEOS from further violations Clean Air Act, 42 U.S.C. § 7401

*et seq.*; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et seq.*;

and the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as

amended, 42 U.S.C. § 9601 *et seq.*; and their implementing permits and regulations.

310.　　　Order INEOS promptly to take all steps necessary or appropriate to comply with the

foregoing laws, regulations and permits.

311.　　　A judgment assessing civil penalties as provided in Section 113(b) of the CAA, 42

U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act, against

LANXESS of up $27,500 per day for each violation occurring prior to March 16, 2004, up to

$32,500 per day for each violation occurring between March 16, 2004 and September 30, 2007,

and INEOS to penalties of up to $32,500 per day for each violation occurring between October 1,

2007 and January 12, 2009, and up to $37,500 per day for each violation after January 12, 2009.

- 59 -

312.    A judgment assessing civil penalties of up to $25,000 per day for each violation

against Defendants payable to the State of Ohio for the violations set forth in Counts XXIV

through XXVI of this Complaint.

313.    Award Plaintiffs the costs and disbursements in this action.

314.    Award such other relief as this Court may deem just and proper.


FOR THE UNITED STATES:



                            Respectfully Submitted,


                            _____
                            JOHN C. CRUDEN
                            Acting Assistant Attorney General
                            Environment and Natural Resources
                              Division


                            _____
                            CATHERINE BANERJEE ROJKO
                            Senior Attorney
                            Environmental Enforcement Section
                            Environment and Natural Resources
                              Division
                            United States Department of Justice
                            Post Office Box 7611
                            Washington, D.C.  20044
                            202.514.5315
                            202.514.0097 (fax)

- 60 -

GREGORY G. LOCKHART
United States Attorney
Southern District of Ohio

PATRICK D. QUINN
(Bar No.0022602)
Assistant United States Attorney
221 East Fourth Street
Suite 400
Cincinnati, Ohio 45202

OF COUNSEL:

Mark J. Palermo
Robert L. Thompson
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Chicago, IL 60604

Tahani Rivers
Attorney-Advisor
Office of Civil Enforcement
Mail Code 2248A
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

- 61 -

FOR THE STATE OF OHIO:


RICHARD CORDRAY
Ohio Attorney General



GREGG H. BACHMANN
Assistant Attorney General
Environmental Enforcement Section
30 E. Broad St., 25th Floor
Columbus, Ohio 43215-2766